LUXTON *v.* NORTH RIVER BRIDGE COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 1040. Submitted January 5, 1894. — Decided May 14, 1894.

Congress, under the power to regulate commerce among the States, may create a corporation to build a bridge across navigable water between two States, and to take private lands for the purpose, making just compensation.

The act of July 11, 1890, c. 669, to incorporate the North River Bridge Company, and to authorize the construction of a bridge across the Hudson River between the States of New York and New Jersey, is constitutional.

THIS was a petition by the North River Bridge Company, incorporated by the act of Congress of July 11, 1890, c. 669, (the material part of which is copied in the margin,[1] ) for the

---

[1] AN act to incorporate the North River Bridge Company, and to authorize the construction of a bridge and approaches at New York City across

appointment under that act of commissioners to assess damages for the appropriation and condemnation, for the approaches to

the Hudson River, to regulate commerce in and over such bridge between the States of New York and New Jersey, and to establish such bridge a military and post road.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That authorization is hereby given to Jordan L. Mott, John King McLanahan, James Andrews, Thomas F. Ryan, Garrett A. Hobart, F. W. Roebling, Charles J. Canda, Edward F. C. Young, Henry Flad, Gustav Lindenthal, A. G. Dickinson, John H. Miller, William Brookfield, Samuel Rea, William F. Shunk, Philip E. Chapin, and their associates, as a corporation as hereinafter provided, to locate, build, maintain, equip and operate a bridge, proper approaches thereto, and terminals, appurtenances and works connected therewith, across the Hudson River in and between the city of New York, in the State of New York, and the State of New Jersey, and to lay tracks thereon for the connection of the railroads on either side of said river, in order to facilitate interstate commerce in the transportation of persons and property, and for vehicle, pedestrian, postal, military and other purposes : Provided, that said bridge shall have not less than six railroad tracks, with a capacity for four additional tracks for future enlargement, and shall be constructed with a single span over the entire river between the towers, located between the shore and the established pier head lines in either State, and at an elevation above the river not less than that of the existing Brooklyn suspension bridge over the East River, and which elevation may be increased by the Secretary of War as hereinafter provided, and that no pier or other obstruction to navigation, either of a temporary or permanent character, shall be constructed in the river between said towers.

Sec. 2. That the construction of said bridge shall be commenced within three years after the passage of this act, and shall be completed within ten years after the commencement of construction. But that the Secretary of War is hereby authorized to extend the time for the commencement of construction for two additional years upon cause shown by the company, and provided that the Secretary of War shall deem such cause sufficient and satisfactory-; and that, if the company fail to commence the construction of said bridge within the time so extended, this act shall be null and void. And the company, at least three months previous to commencing the erection of said bridge, shall submit to the Secretary of War a plan of the bridge, with a detailed map of the river at the proposed site of the bridge, and for the distance of one half of a mile above and below the site, with such other information as the Secretary of War may require for a full and satisfactory understanding of the subject. And the Secretary of War may, upon receiving said plans and map and other information, order a hearing before a board of engineers, appointed by him for taking testimony of persons interested in railroads and navigation, relative to the clear height of

its bridge across the Hudson or North River, between the States of New York and New Jersey, of land of Sarah Luxton

---

the superstructure above ordinary high water.  Such clear height shall not be less than that named in section one of this act, and the Secretary of War may thereupon order such additional clear height as he shall deem necessary for the security of navigation.  And he is hereby authorized and directed, upon being satisfied that a bridge built on such plan and at said locality will conform to the conditions of this act, to notify the said company that he approves the plans therefor; whereupon said company may proceed to the erection of said bridge.  But until the Secretary of War approve the plan and location of said bridge the erection of the same shall not be commenced; and should any change be made in the plan of the bridge during the progress of the work thereon, such change shall likewise be subject to the approval of the Secretary of War.

SEC. 3.  That the bridge, with its approaches and railroad thereover, constructed under the provisions of this act, shall be a lawful structure, and a military and post road, but no toll charges shall be made for the transmission over the same of the mails of the United States, or for the right of way for the United States postal telegraph purposes.

SEC. 4.  That for the purpose of carrying into effect the objects stated in this act, the persons named in the first section hereof, and their associates, are hereby constituted and created a body corporate in law, to be known as the North River Bridge Company, and by that name, style and title shall have perpetual succession; may sue and be sued, implead and be impleaded, complain and defend in all courts of law and equity, of record and otherwise; may make and have a common seal, and shall have and possess all rights, powers, franchises and privileges incident to or usually possessed by such companies.  It may receive, purchase, and also acquire by lawful appropriation and condemnation, upon making proper compensation therefor, to be ascertained according to the laws of the State within which the same is located, real and personal property and rights of property, and may mortgage, encumber, charge, pledge, grant, lease, sell, assign and convey the same.  And to aid in the construction of said bridge and approaches thereto, and railroad terminals, appurtenances and works connected therewith, and to carry out the purposes of this act, the said North River Bridge Company is hereby authorized to issue its bonds, and secure the same by mortgage on its property and rights of property, of all kinds and descriptions, and its franchise to be a corporation.  And generally and specially for the fully carrying out of the purposes and intentions of this act, the said North River Bridge Company, and its successors, shall have and possess all such rights and powers to enter upon lands, and for the purchase, acquisition, condemnation, appropriation, occupation, possession and use of real estate and other property, and for the location, construction, operation and maintenance of said bridge with its approaches, terminals and appurtenances, as are possessed by railroad or bridge companies in the

in the city of Hoboken and the county of Hudson in the latter
State.    Upon the order of the Circuit Court, appointing com-
missioners, she sued out a writ of error, which was dismissed
by this court at the last term, because that order was not a
final judgment.    147 U. S. 337.    The commissioners after-
wards made an award and report, assessing her damages at the
sum of $2000, to the acceptance of which she objected, upon
the ground that the act of Congress was unconstitutional, and
particularly that Congress. could not confer the right of emi-
nent domain upon the company.    But the court overruled the
objection, and adjudged that the award be approved and con-
firmed, and remain of record in the office of its clerk; and that,
upon payment or tender of the sum awarded, the company
might enter upon and take possession of the land for the pur-
pose for which it was condemned.    She thereupon sued out
this writ of error.

*Mr. Gilbert Collins* for plaintiff in error.

*Mr. Joseph D. Bedle,* for defendant in error.

*Mr. Josiah M. Vale,* by leave of court, filed a brief on

---

States of New York and New Jersey, respectively.    That all persons, rail-
road and telegraph companies, respectively, desiring to use said bridge,
shall have and be entitled to equal rights and privileges in the passage over
and the use of the same, and the approaches thereto, for a reasonable
compensation, to be approved by the Interstate Commerce Commission as
hereinafter determined, and to be paid to the North River Bridge Company,
which is hereby duly empowered to collect the same.    And sufficient
trackage and terminal facilities shall be provided for all railroads desiring
to use said bridge and appurtenances.    In case any litigation arises out of
the construction, use or operation of said bridge or approaches thereto and
railroad thereon, or for the condemnation or the appropriation of property
in connection therewith under this act, the cause so arising shall be heard
and tried before the Circuit Court of the United States for the judicial
district in which the bridge or one of the approaches is located.    Applica-
tions for condemnation or appropriation of property shall be made in the
Circuit Court of the United States for the district in which such property is
situated, upon the petition of said company; and the hearing and trial of all
other proceedings thereon shall conform as nearly as may be to the practice
in the courts of the State, in which such district is situated, in the case of
condemnation or appropriation of property for railroads.    26 Stat. 268–270.

behalf of Crevier, a party in like interest with the plaintiff in error.

Mr. Justice Gray, after stating the case, delivered the opinion of the court.

The validity of the act of Congress incorporating the North River Bridge Company rests upon principles of constitutional law, now established beyond dispute.

The Congress of the United States, being empowered by the Constitution to regulate commerce among the several States, and to pass all laws necessary or proper for carrying into execution any of the powers specifically conferred, may make use of any appropriate means for this end. As said by Chief Justice Marshall, "The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war, or levying taxes, or of regulating commerce, a great substantive and independent power, which cannot be implied as incidental to other powers, or used as a means of executing them. It is never the end for which other powers are exercised, but a means by which other objects are accomplished." Congress, therefore, may create corporations as appropriate means of executing the powers of government, as, for instance, a bank for the purpose of carrying on the fiscal operations of the United States, or a railroad corporation for the purpose of promoting commerce among the States. *McCulloch* v. *Maryland,* 4 Wheat. 316, 411, 422; *Osborn* v. *Bank of United States,* 9 Wheat. 738, 861, 873; *Pacific Railroad Removal Cases,* 115 U. S. 1, 18; *California* v. *Pacific Railroad,* 127 U. S. 1, 39. Congress has likewise the power, exercised early in this century by successive acts in the case of the Cumberland or National Road from the Potomac across the Alleghenies to the Ohio, to authorize the construction of a public highway connecting several States. See *Indiana* v. *United States,* 148 U. S. 148. And whenever it becomes necessary, for the accomplishment of any object within the authority of Congress, to exercise the right of eminent domain and take private lands, making

just compensation to the owners, Congress may do this, with or without a concurrent act of the State in which the lands lie. *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 154, and cases cited; *Cherokee Nation* v. *Kansas Railway*, 135 U. S. 641, 656.

From these premises, the conclusion appears to be inevitable that, although Congress may, if it sees fit and as it has often done, recognize and approve bridges erected by authority of two States across navigable waters between them, it may, at its discretion, use its sovereign powers, directly or through a corporation created for that object, to construct bridges for the accommodation of interstate commerce by land, as it undoubtedly may to improve the navigation of rivers for the convenience of interstate commerce by water. 1 Hare's Constitutional Law, 248, 249. See acts of July 14, 1862, c. 167; 12 Stat. 569; February 17, 1865, c. 38; 13 Stat. 431; July 25, 1866, c. 246; 14 Stat. 244; March 3, 1871, c. 121, § 5; 16 Stat. 572, 573; June 16, 1886, c. 417; 24 Stat. 78.

The judicial opinions cited in support of the opposite view are not, having regard to the facts of the cases in which they were uttered, of controlling weight.

Mr. Justice McLean, indeed, in an opinion delivered by him in the Circuit Court, by which a bill by the United States to restrain the construction of a bridge across the Mississippi River was dismissed, no injury to property of the United States and no substantial obstruction to navigation being shown, and there having been no legislation by Congress upon the subject, took occasion to remark that "neither under the commercial power, nor under the power to establish post roads, can Congress construct a bridge over a navigable water;" that "if Congress can construct a bridge over a navigable water, under the power to regulate commerce or to establish post roads, on the same principle it may make turnpike or railroads throughout the entire country;" and that "the latter power has generally been considered as exhausted in the designation of roads on which the mails are to be transported; and the former by the regulation of commerce upon the high seas and upon our rivers and lakes." *United States* v. *Railroad Bridge Co.*, 6 McLean, 517, 524, 525.

The same learned justice repeated and enlarged upon that idea in his dissenting opinion in *Pennsylvania* v. *Wheeling Bridge*, 18 How. 421, 442, 443, where, after the Wheeling Bridge, constructed across the Ohio River under an act of the State of Virginia, had by a decree of this court, at the suit of the State of Pennsylvania, been declared to be in its then condition an unlawful obstruction of the navigation of the river, and in conflict with the acts of Congress regulating such navigation, and therefore ordered to be elevated or abated, Congress passed an act, declaring the bridge to be a lawful structure in its then position and elevation, establishing it as a post road for the passage of the mails of the United States, authorizing the corporation to have and maintain the bridge at that site and elevation, and requiring the captains and crews of all vessels and boats navigating the river to regulate the use thereof, and of any pipes or chimneys belonging thereto, so as not to interfere with the elevation and construction of the bridge. Act of August 31, 1852, c. 111, §§ 6, 7; 10 Stat. 112.

But the majority of this court in that case held that "the act of Congress afforded full authority to the defendants to reconstruct the bridge." 18 How. 436. Mr. Justice Nelson, in delivering its opinion, said: "We do not enter upon the question, whether or not Congress possess the power, under the authority of the Constitution to establish post offices and post roads, to legalize this bridge; for, conceding that no such powers can be derived from this clause, it must be admitted that it is, at least, necessarily included in the power conferred to regulate commerce among the several States. The regulation of commerce includes intercourse and navigation, and, of course, the power to determine what shall or shall not be deemed in judgment of law an obstruction to navigation; and that power, as we have seen, has been exercised consistently with the continuance of the bridge." 18 How. 431. And Mr. Justice Daniel, in a concurring opinion, sustaining the validity of the act of Congress, said: "They have regulated this matter upon a scale by them conceived to be just and impartial, with reference to that commerce which pursues

the course of the river, and to that which traverses its chan-
nel, and is broadly diffused through the country.   They have
at the same time, by what they have done, secured to the gov-
ernment, and to the public at large, the essential advantage
of a safe and certain transit over the Ohio."   18 How. 458.
A similar decision was made in *The Clinton Bridge*, 10 Wall.
454.   See also *Miller* v. *New York*, 109 U. S. 385.

In the cases, cited at the bar, of *The Passaic Bridges*, 3
Wall. appx. 782, decided by Mr. Justice Grier in the Circuit
Court, and of *Gilman* v. *Philadelphia*, 3 Wall. 713, and
*Wright* v. *Nagle*, 101 U. S. 791, in this court, the bridge in
question had been erected under authority of a State and was
wholly within the State, and no question arose, or was con-
sidered, as to the power of Congress, in regulating interstate
commerce, to authorize the erection of bridges between two
States.

But in *Stockton* v. *Baltimore & New York Railroad*, 32
Fed. Rep. 9, Mr. Justice Bradley, sitting in the Circuit Court,
upheld the constitutionality of the act of Congress of June 16,
1886, c. 417, authorizing a corporation of New York and one
of New Jersey to build and maintain a bridge, as therein
directed, across the Staten Island Sound or Arthur Kill. 24
Stat. 78.

The reasons upon which the decision in that case rested
were, in substance, the same as were stated by that eminent
judge in two opinions afterwards delivered by him in behalf
of this court, in which the power of Congress, by its own
legislation, to confer original authority to erect bridges over
navigable waters, whenever Congress considers it necessary to
do so to meet the demands of interstate commerce by land, is
so clearly demonstrated, as to render further discussion of the
subject superfluous.

In *Willamette Bridge* v. *Hatch*, 125 U. S. 1, in which it was
held that section 2 of the act of February 14, 1859, c. 33, (11
Stat. 383,) for the admission of Oregon into the Union, pro-
viding that "all the navigable waters of the said State shall
be common highways, and forever free, as well to the inhabi-
tants of said State as to all other citizens of the United States,"

did not prevent the State, in the absence of legislation by Congress, from authorizing the erection of a bridge over such a river, Mr. Justice Bradley, speaking for the whole court, said : " And although, until Congress acts, the States have the plenary power supposed, yet, when Congress chooses to act, it is not concluded by anything that the States, or that individuals by its authority or acquiescence, have done, from assuming entire control of the matter, and abating any erections that may have been made, and preventing any others from being made, except in conformity with such regulations as it may impose. It is for this reason, namely, the ultimate (though yet unexerted) power of Congress over the whole subject-matter, that the consent of Congress is so frequently asked in the erection of bridges over navigable streams. It might itself give original authority for the erection of such bridges, when called for by the demands of interstate commerce by land ; but in many, perhaps the majority of cases, its assent only is asked, and the primary authority is sought at the hands of the State." 125 U. S. 12, 13.

In *California* v. *Pacific Railroad,* 127 U. S. 1, it was directly adjudged that Congress has authority, in the exercise of its power to regulate commerce among the several States, to authorize corporations to construct railroads across the States, as well as the Territories of the United States; and Mr. Justice Bradley, again speaking for the court, and referring to the acts of Congress establishing corporations to build railroads across the continent, said : " It cannot at the present day be doubted that Congress, under the power to regulate commerce among the several States, as well as to provide for postal accommodations and military exigencies, had authority to pass these laws. The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from State to State, is essential to the complete control and regulation of interstate commerce. Without authority in Congress to establish and maintain such highways and bridges, it would be without authority to regulate one of the most important adjuncts of commerce. This power in former times was exerted to a very limited extent, the

Cumberland or National Road being the most notable instance. Its exertion was but little called for, as commerce was then mostly conducted by water, and many of our statesmen entertained doubts as to the existence of the power to establish ways of communication by land. But since, in consequence of the expansion of the country, the multiplication of its products, and the invention of railroads and locomotion by steam, land transportation has so vastly increased, a sounder consideration of the subject has prevailed, and led to the conclusion that Congress has plenary power over the whole subject. Of course, the authority of Congress over the Territories of the United States, and its power to grant franchises exercisible therein, are, and ever have been, undoubted. But the wider power was very freely exercised, and much to the general satisfaction, in the creation of the vast system of railroads connecting the East with the Pacific, traversing States as well as Territories, and employing the agency of state as well as Federal corporations." 127 U. S. 39, 40.

The act of Congress now in question declares the construction of the North River Bridge between the States of New York and New Jersey to be "in order to facilitate interstate commerce;" and it makes due provision for the condemnation of lands for the construction and maintenance of the bridge and its approaches, and for just compensation to the owners, which has been accordingly awarded to the plaintiff in error.

In the light of the foregoing principles and authorities, the objection made to the constitutionality of this act cannot be sustained.

*Judgment affirmed.*